UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ZACHARY POOLE,

      Plaintiff,

v.

MACOMB COUNTY,
RYAN STATELER, and
WILLIAM HOPPE,

      Defendants.

Case No. 2:19-cv-13544
Honorable Laurie J. Michelson

---

**OPINION AND ORDER
GRANTING MACOMB COUNTY AND HOPPE'S MOTION FOR
SUMMARY JUDGMENT [63] AND GRANTING IN PART AND
DENYING IN PART STATELER'S MOTION FOR SUMMARY
JUDGMENT [64]**

---

In 2018, Zachary Poole informed his jailers that he had been kicked in the face by one of his cell mates. Two deputies, Ryan Stateler and William Hoppe, soon arrived at the cell and told Poole that he was being moved. As Poole neared the cell's exit with his belongings, Poole threw a cup of water (or possibly urine) at the person who had kicked him. Hoppe recalls that several of the detainees began to rush toward the door—a fight was about to break out. Stateler recalls that he quickly pulled Poole through the cell door for their safety, that the two got entangled, and that Poole happened to hit his head on the wall opposite the cell's exit. But Poole thinks Stateler slammed his head against the wall. Poole also says

Stateler took him to the ground, then slammed his knee into his back, and then stood up and dropped his knee down on his back.

Over a year after the incident, Poole sued Stateler, Hoppe, and their employer at the time, Macomb County. He alleges that the two deputies used force prohibited by the Constitution. Poole also claims that the County failed to adequately train the deputies on the proper use of force and failed to supervise the deputies.

Defendants ask this Court for summary judgment. They say that no reasonable jury could find that the force they used was excessive. As to Hoppe, the Court agrees. But taking the evidence in the light most favorable to Poole, a reasonable jury could find that Stateler used excessive force. So Stateler is not entitled to summary judgment. As for Poole's claim against Macomb County, Poole has insufficient evidence that the County failed to adequately train or supervise its deputies or that any such failure was the cause of his injuries.

## I.

### A.

Except where indicated below, the material facts are not genuinely disputed.

In July 2018, Zachary Poole was a pretrial detainee at the Macomb County Jail. (ECF No. 65, PageID.785; ECF No. 73, PageID.2632.) Poole shared a relatively large cell with eight (or so) others. (*See* ECF No. 70-6, PageID.1821–1828; *but cf.* ECF No. 65, PageID.786.) The cell had a large table, several bunk

beds, and a television. (*See* ECF No. 65, PageID.796; ECF No. 63-5, PageID.510–518 (photos of cell).)

On July 19, 2018, Poole was attacked by one of his cell mates. Poole was trying to sleep, but other people in his cell were excitedly watching sports on the television. (PageID.796.)[1] The two activities did not mix well, and Poole repeatedly asked his cell mates to keep it down. (PageID.789–790.) Eventually, one of the detainees became irritated with Poole's requests. (*See* PageID.791.) Poole recalls, "[he] basically told me if I don't be quiet and stop talking he's going to come over there and whip my ass." (PageID.791.) According to Poole, "I laid back down, closed my eyes, was going back to sleep, next thing I know the inmate comes up to me and starts kicking me in the face." (PageID.791.) Poole rushed to the emergency intercom in the cell: "'I just got kicked in the face. I need help.'" (PageID.793, 798.)

Within two minutes, corrections deputies Ryan Stateler and William Hoppe arrived at Poole's cell. (PageID.942, 1052.) The deputies planned to move Poole to a different place in the jail. So they directed Poole to gather his belongings. (PageID.1003.)

As Poole grabbed his small storage bin and collected his things, an idea for getting even came to him. (PageID.819.) While collecting his belongings, Poole picked up a cup with water or urine in it. (PageID.818.) And as he neared the cell's

---

[1] Unless indicated otherwise, all citations are to ECF No. 65 and the associated exhibits.

3

door, Poole threw the cup at the detainee who had kicked him. (PageID.818–819; PageID.1062.) The liquid splashed on two or more of the detainees. (*See* PageID.994; PageID.1003; ECF No. 70-6, PageID.1823, 1827–1828.)

From the two deputies' perspective, a huge fight was imminent. Although a few of Poole's cell mates say they were sleeping (ECF No. 70-6, PageID.1821, 1822, 1824), Hoppe recalls, "it was like an angry mob charging the door" (PageID.1064). Hoppe further recalls, "you have like an oh, shit moment because . . . you're either going to get beat up, you know, it's either you're going to slam that door and you're going to, you know, pull everybody out and sa[v]e yourself or, you know, you're going to be in for the fight of your life." (PageID.1005.) Stateler similarly recalls, "I was scared for my safety and [Hoppe's] and Mr. Poole's safety." (PageID.967.)

So the deputies quickly grabbed Poole and pulled him out of the cell. As they did so, Poole hit his head against a concrete wall opposite the cell's exit. (PageID.827, 871.) According to Poole, "they slammed me into the wall, where I bashed my head, I was leaking blood." (PageID.848.) One of the detainees, Welton Turner, agrees with Poole: "He sl[u]ng him against the wall. [Poole was] coming out the cell, [the deputy] grabbed him, boom, slammed him." (PageID.1151.) But Stateler recalls things differently: "When I pulled [Poole] out of the door, I don't know if we got tangled up in the bin that he had dropped or if our feet just got tangled up, but we both lost our balance. I was able to catch myself and as we came out of the doorway, the momentum between the two of us is when he must have hit the wall." (PageID.946.) As for Hoppe, he did not see Poole hit the wall;

4

Hoppe says he was busy "slamming the [cell] door and engaging the locking mechanism" to prevent the other detainees from rushing Poole. (PageID.1028; *see also* PageID.1005.)

After Poole's head hit the wall, Stateler took Poole to the ground. According to Stateler, he wanted to handcuff Poole while Poole was standing up, but Poole was resisting. (PageID.948.) Stateler recalls, "Deputy Hoppe was still working on getting the door secured to keep the other inmates from coming out. So I had to take [Poole] to the floor to gain control of the situation." (PageID.948.) Stateler says he used "a controlled takedown technique that we're taught through our training." (PageID.948.) Poole remembers these events differently: "[A]fter slamming my head . . . into the wall, . . . Stateler stated, 'Stop resisting.' And which I don't know how I'm going to resist after I'm dazed from having my head slammed literally into the wall. . . . And then that's when he slammed me to the ground." (PageID.827.)

From here, the accounts continue to diverge.

Start with the deputies' accounts. Stateler says that Poole was face down on the ground and holding his arms under his chest or stomach, preventing the deputies from handcuffing him. (PageID.949.) Stateler recalls that he was kneeling beside Poole, with one knee on the ground and the other on top of Poole's shoulder "to gain control of his upper body while attempting to gain control of his hands." (PageID.949.) Hoppe's account somewhat aligns with Stateler's. He too recalls Poole "keeping his hands tucked tightly underneath his chest, you know,

5

so we couldn't handcuff him." (PageID.1068.) And, like Stateler, he remembers Stateler kneeling down beside Poole and using one knee on Poole's shoulder to restrain Poole. (PageID.1014, 1068.) But unlike Stateler, Hoppe says that because Poole was not compliant, even after "multiple orders to give up his hands," Stateler delivered two or three knee strikes to Poole's side. (PageID.1014–1015, 1069, 1081.) Hoppe recalls that after the knee strikes, he and Stateler were able to pull Poole's arms out from under him and handcuff him. (PageID.1016.)

Poole's account is very different from Stateler's and Hoppe's. To start, Poole is adamant that he did not resist. (PageID.827, 853.) And, according to Poole, the deputies never told him to put his hands behind his back so he could be handcuffed. (PageID.826.) And regarding Stateler's knee strikes, he agrees with Hoppe that they happened, but Poole says they happened in a much more violent manner: "[Stateler] took his knee, slammed his knee into my lower mid back. Hoppe was still kind of like on one knee, you know, like just restraining me, kind of. And then Stateler stood up again, slammed his knee into my back again." (PageID.827.) While Poole claims that he could see a "majority" of Stateler's body despite being pinned face down on the floor, he recalls Stateler standing all the way up and coming back down with his knee into his back. (PageID.850, 852–853, 870.) Poole believed that the two knee strikes came five or 10 seconds apart (PageID.869) and thought that he was on the ground anywhere from 30 to 90 seconds before he was handcuffed (*see* PageID.854–855).

6

Turner's account aligns with Poole's. Turner recalls, "All I seen was them slamming him against the wall and then the officer came, he jumped straight on his back with the knee. He dropped, boom . . . it [was] uncalled for the knee to the back." (PageID.1150.)

After Stateler and Hoppe handcuffed Poole, they noticed a cut above Poole's eye. (PageID.1075.) So the deputies took Poole to the medical services at the jail. But no one at the jail that night could suture the cut. (PageID.1200.) So Poole was sent to the hospital. (*Id.*)

According to records from the hospital, Poole's injuries were not severe. Aside from the laceration above his eye, the records state, "[h]e describes some mild pain to the maxillary area, where he was kicked by the other inmate. In addition, he describes mild pain to his lower back." (ECF No. 70-8, PageID.1864.) Upon exam, Poole did not have tenderness in his thoracic spine and only had "mild" tenderness in the lumbar area. (ECF No. 70-8, PageID.1865.) And there was no bruising or signs of trauma. (*Id.*) A lumbar x-ray was negative for acute facture or partial dislocation. (*See* ECF No. 70-8, PageID.1869.)

B.

Over a year after Stateler and Hoppe pulled Poole from his cell, Poole sued them. He also sued their employer at the time of the incident, Macomb County.

Poole's amended complaint has three counts. In Counts I and III, Poole claims Stateler and Hoppe used excessive force in violation of the Eighth Amendment and Fourteenth Amendment, respectively. (ECF No. 41, PageID.161,

7

164.) In Count II, Poole claims that Macomb County is liable for its failure to adequately train or supervise its correctional officers. (ECF No. 41, PageID.163.)

The parties completed discovery, and Defendants now seek summary judgment. To be more precise, Hoppe and Macomb County have filed one summary-judgment motion (ECF No. 63), and Stateler, who no longer works for Macomb County, has filed his own (ECF No. 64).

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

The Court will address Poole's claims against Stateler, Hoppe, and Macomb County in that order.

## A.

Not everything has to be complicated; sometimes, a simple analysis leads to the correct result. That is the case here. When coupling the summary-judgment standard with Poole's testimony, Poole is entitled to present his claim against Stateler to a jury.

Start with the standard. At summary-judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). As the Sixth Circuit explained in another excessive-force case: "It is true that the evidence of

the deputies at this stage appears significantly stronger than that of Shreve. All except Shreve testified consistently to a version of events in which no excessive force occurred. Shreve, however, swore to a version of the facts that does amount to excessive force. . . . It is therefore ultimately up to the jury to believe her or not." *Shreve v. Jessamine Cty. Fiscal Ct.*, 453 F.3d 681, 687–88 (6th Cir. 2006); *see also Harris v. Langley*, 647 F. App'x 585, 589 n.1 (6th Cir. 2016) (providing that district courts are "required" to take the evidence in the light most favorable to the non-moving party before deciding whether force was excessive). Thus, the Court must accept as true Poole's account of what happened.

So what did Poole say happened? According to Poole, he was lying on the ground, not resisting. (PageID.825, 853, 879.) At that point, Stateler "slammed" his knee into his back then stood up "completely" and "once again drop[ped] his knee into [his] back." (PageID.827, 850, 853.)

Now apply the summary-judgment standard. Assuming (as the Court must) Poole was lying face down on the ground and not resisting, and Stateler twice slammed his knee into Poole's back (including by dropping his knee into Poole's back from the standing position), the force Stateler used was excessive. *See Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015) ("When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot.").

All of that is straightforward enough, but Stateler seeks to unduly complicate matters.

9

For one, Stateler tries to raise the bar for establishing liability. Stateler recognizes that Poole was a pretrial detainee, and acknowledges that under *Kingsley v. Hendrickson*, pretrial detainees only have to show that the defendant's use of force was "objectively unreasonable," 576 U.S. 389, 397 (2015). But, according to Stateler, the subjective standard used in *Shreve v. Franklin County, Ohio*, 743 F.3d 126 (6th Cir. 2014), should apply given the particulars of this case. (ECF No. 78, PageID.3070.) *Shreve* involved a claim that jailers used excessive force against a pretrial detainee, and the Sixth Circuit stated that "[w]hen officials respond to a rapidly evolving, fluid, and dangerous predicament, . . . [t]he plaintiff must show that the defendant acted maliciously and sadistically for the very purpose of causing harm[.]" *Id.* at 134. Stateler argues, "[t]he Sixth Circuit's decision i[n] *Shreve* has not been abrogated or overruled by *Kingsley*," and points out that *Kingsley* "involved an assault on a handcuffed inmate, who did not pose a safety risk to officers." (ECF No. 78, PageID.3072.) Because Poole "pose[d] a safety risk" and "caused a jail disturbance," Stateler thinks *Shreve*'s malicious-and-sadistic test, not *Kingsley*'s objective-reasonableness test, applies here. (ECF No. 78, PageID.3070–3071.)

This argument is not persuasive. *Shreve* was not the first case to use the malicious-and-sadistic language. In *Whitley v. Albers*, the Supreme Court stated that when "a prison security measure is undertaken to resolve a disturbance . . . that indisputably poses significant risks to the safety of inmates and prison staff," the ultimate question is "'whether force was applied in a good faith effort to

maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" 475 U.S. 312, 320–21 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). In *Kingsley*, the defendants expressly advocated for an application of *Whitley*'s standard, but the Supreme Court held that *Whitley*'s standard did not apply to excessive force claims brought by pretrial detainees. And the Court's rejection of *Whitley*'s standard did not depend on Kingsley being handcuffed and posing no risk of harm. Instead, the text of the Constitution rendered *Whitley*'s standard inapplicable. The Court explained: "[*Whitley* and *Hudson*] concern excessive force claims brought by convicted prisoners under the Eighth Amendment's Cruel and Unusual Punishment Clause, not claims brought by pretrial detainees under the Fourteenth Amendment's Due Process Clause. The language of the two Clauses differs, and the nature of the claims often differs." *Kingsley*, 576 U.S. at 400. "And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" *Id.* Because the text of the Constitution (specifically, the word "punishment") is what primarily led the Supreme Court to reject a malicious-and-sadistic standard for pretrial detainees, *Shreve*'s malicious-and-sadistic standard is inapplicable to this case—as a pretrial detainee, Poole could not be subject to cruel and unusual "punishment" (much less maliciously and sadistically).

Stateler also makes several points that all have one response. Stateler points out that after Poole threw water or urine on the other detainees, a massive fight was about to break out. So, says Stateler, he had every reason to fear for his

safety, Hoppe's safety, and Poole's safety, and thus, every reason to use some force to protect Poole and preserve order. (*See* ECF No. 64, PageID.735–736, 742.) Stateler also points out that given that Poole had just thrown water or urine on other detainees, it was reasonable for him to think that Poole "could be violent and unpredictable," which further justified using force. (ECF No. 78, PageID.3072.) But even accepting these points, there is still no explanation for why Stateler needed to slam his knee into Poole's back, stand up completely, and then drop down onto Poole's back with his knee. In other words, even if a jury were to credit that a fight was imminent, that the deputies feared for their safety, and that Stateler thought Poole was resisting or potentially dangerous, it could still find that Stateler used much more force than necessary to bring the situation under control. By the time Stateler delivered the knee strikes, Poole was removed from the cell and lying face down on the floor. And, under Hoppe's account (which Stateler does not dispute (ECF No. 64, PageID.725)), by the time Stateler kneed Poole, the cell door was already secured, and thus the other detainees were no longer a threat.

Stateler also stresses that Poole has no evidence of any serious injuries, including no objective evidence of any back injury. (*See* ECF No. 64, PageID.736; ECF No. 78, PageID.3075.) Stateler argues that Poole's minimal injuries undermine his claim of excessive force.

This argument has some merit. In *Kingsley*, the Court listed several considerations that "may bear on the reasonableness or unreasonableness of the

force used," including "the extent of the plaintiff's injury." 576 U.S. at 397. And here, the medical evidence does suggest that Poole suffered only minor injury. When the deputies took Poole for medical treatment at the jail, the nurse only noted that Poole "need[ed] possible sutures"; she did not note anything about Poole's back. (ECF No. 70-7, PageID.1861.) And the nurse later explained that if Poole had complained about his back, she would have noted it. (PageID.1200–1201.) As for the hospital notes from the night of the incident, those indicate that Poole reported only "mild" pain in his lower back. (ECF No. 70-8, PageID.1864.) Upon examination, Poole only had "mild" tenderness in his lumbar area with no signs of bruising or trauma. (ECF No. 70-8, PageID.1865.) And the lumbar x-ray revealed "no acute fracture or subluxation [partial dislocation]." (ECF No. 70-8, PageID.1869.) Indeed, the doctor who took the x-ray would later explain that this description of the x-ray meant that he found no injury. (PageID.1254.)

Although that medical evidence strongly favors Stateler, not all the medical evidence goes on Stateler's side of the ledger. The hospital records from the night of the incident do state that Poole had mild tenderness in his lower back. Yet Stateler says that Poole was not kneed at all. If that were true, why was Poole's lower back tender? Poole also testified that before the incident, he never had back pain (which a jury could believe given that Poole was only 24 years old when he was allegedly kneed). (PageID.872.) Poole's treatment in the months following the incident also support his cause. About three months after Stateler allegedly kneed Poole in the back, Poole complained to jail medical staff that ibuprofen was not

13

working for his back pain and that he was unable to stay asleep. (ECF No. 70-7, PageID.1860.) About seven months after the incident, Poole again sought care for back pain; the notes state, "Got into fight while incarcerated—guy put his knee into back twice. 8/10 severity at it's worst, but closer to 3/10 today. . . . Pain exacerbated with snow shoveling, washing dishes." (ECF No. 70-9, PageID.1884.) Poole also sought treatment for back pain 9, 18, and 20 months after the alleged kneeing. (ECF No. 70-7, PageID.1881, 1830, 1853.) Although the medical records do not include objective findings like an MRI or EMG, Poole's repeat efforts to obtain treatment for back pain lend some support to his assertion that Stateler twice slammed his knee into his back.

Moreover, the Court in *Kingsley* did not say that the plaintiff's injuries are the only consideration relevant to the excessive-force inquiry. Far from it. The Court also identified the following relevant considerations: "the relationship between the need for the use of force and the amount of force used," "any effort made by the officer to temper or to limit the amount of force," "the severity of the security problem at issue," "the threat reasonably perceived by the officer," "and whether the plaintiff was actively resisting." 576 U.S. at 397. (And even this list is not exhaustive. *See id.*)

Taking the evidence in the light most favorable to Poole, these factors could support a finding of excessive force. Poole testified that while on the ground, he was not resisting. As for the "severity of the security problem," a jury could find that by the time Poole was on the ground, Hoppe had locked the door to the cell,

and so the other detainees were no longer a threat. Further, Poole was unarmed and face down on the ground when the knee strikes were allegedly delivered. And while perhaps the compliance-inducing knee strikes that Hoppe described might have been proportional to the need to get Poole handcuffed, Poole testified that Stateler "slammed" his knee into his lower back, stood up "completely," and then "drop[ped]" his knee into his lower back again. (PageID.827, 850, 853.) So, under Poole's account, two more factors—"the relationship between the need for the use of force and the amount of force used" and "any effort made by the officer to temper or to limit the amount of force"—favor a finding of excessive force. Finally, consider the fact that Turner, an eyewitness, largely corroborates Poole's account: "he jumped straight on his back with the knee. He dropped, boom, the knee was already—like it uncalled for the knee to the back." (ECF No. 65-5, PageID.1150.) In all, while close, the Court finds that a reasonable jury crediting Poole's testimony could find that Stateler used objectively unreasonable force while Poole was lying on the ground.

Finally, Stateler asserts qualified immunity. (ECF No. 64, PageID.742.) But in doing so he merely argues that he did not violate Poole's constitutional rights. (ECF No. 64, PageID.742.) Yet, as just discussed, a reasonable jury could find that Stateler used objectively unreasonable force in violation of the Fourteenth Amendment. And even if Stateler had argued the other prong of qualified immunity, Poole is adamant that he did not resist, and it was clearly established in 2018 that officers cannot use force (and certainly not powerful knee strikes)

when a citizen is not actively resisting. *Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015).

\* \* \*

To sum up, the analysis of Poole's excessive force claim against Stateler is not complicated. When deciding a motion for summary judgment, this Court must accept Poole's version of the events. And his version of the events is that while he was lying face down on the ground, not resisting, Stateler "slammed" his knee into his back, stood back up "completely," and then "drop[ped]" his knee into his back. (PageID.827, 850, 853.) A reasonable jury could find that to be objectively unreasonable—i.e., excessive—force.

## B.

Although Hoppe makes many of the same unconvincing arguments as Stateler—including initially arguing that *Whitley*'s subjective standard should govern (ECF No. 63, PageID.296)—the undisputed facts warrant granting Hoppe summary judgment. In particular, there were three moments that the deputies used force that resulted (or could have resulted) in injury, and the record shows that each time, Hoppe was not the deputy who used force.

The first use of force was when Poole smacked his head against a wall facing the cell's exit. At some parts of his testimony, Poole (and Turner) use the word "they" or "both," thus suggesting that both Hoppe and Stateler pulled Poole through the cell's door and slammed his head against the wall. (*See e.g.*, PageID.867, PageID.1140.) But in describing being slammed against the wall,

16

Poole testified, "I do feel like Stateler was . . . the majority of force was from him." (PageID.871.) Poole also agreed that Hoppe "was sort of going along for the ride." (PageID.871–872.) As for Stateler, he used "I" when describing what happened: "I dragged him out of the unit, I pulled him out of the door." (PageID.946, 948.) And Hoppe recalled, "So Stateler grabs Poole and he jerks him out of the doorway. . . . by the time that I had slammed the door and locked the door to keep the guys from getting out of the unit, Stateler and Poole were on the ground." (PageID.1064.) Given that all accounts align, no reasonable jury could find that Hoppe was responsible for Poole's head hitting the wall.

Next consider Poole being taken to the ground. Poole says Stateler took him to the ground. (PageID.824.) Stateler agrees. (PageID.948.) As for Hoppe, he says he was busy locking the door. (PageID.1064.) So no reasonable jury could find that Hoppe was responsible for Poole being taken to the ground.

That leaves the deputies' use of force when Poole was on the ground. Poole says that it was Stateler who kneed him the back. (PageID.825, 827.) In fact, Poole says that Hoppe "was just restraining me, like holding me down onto the ground." (PageID.825; *see also* PageID.827, 842, 850.) Hoppe likewise says Stateler employed knee strikes. (PageID.1068.) Although Stateler denies kneeing Poole, he does not assert that Hoppe did. (PageID.970.) As for Turner, although he incorrectly recalled three deputies, he did say that the deputy who locked the door was not the one who kneed Poole. (PageID.1151, 1157.) So no reasonable jury could find that Hoppe used excessive force while Poole was on the ground.

17

\* \* \*

In sum, a reasonable jury listening to the eyewitness testimony of what transpired could not find that Hoppe used excessive force. Poole's claims against Hoppe will be dismissed.

## C.

That leaves Poole's claim against Macomb County. (ECF No. 72, PageID.2299.)

Poole first seeks to establish the County's liability under a failure-to-train theory of municipal liability. Poole asserts that when Hoppe responded to his call for help, Hoppe was still a new hire on probationary status, that he had not yet attended the corrections officer academy, that he had only taken a "single-day introductory session" on the use of force, and that he admitted that his report on the incident had mistakes because he was new to the job. (ECF No. 72, PageID.2299.) As for Stateler, Poole argues that he too started working at the Macomb County Jail before attending the corrections officer academy; in fact, says Poole, Stateler had even used force before going to the academy. (*Id.*) From Poole's perspective, all this goes to show that Macomb County is liable for not adequately training the deputies that work at its jail.

As an initial matter, Poole undersells the training that Macomb County provided to Hoppe and Stateler. It is true that Hoppe was new at the jail and had not attended the academy when he responded to Poole's call for help. In fact, the incident with Poole was the first time that Hoppe had been involved in a use-of-

18

force incident. (PageID.1076.) But before Hoppe started working at the jail, he had three days of training, with an entire day dedicated to the use of force. (PageID.1090, 1092.) And, as part of his onboarding, Hoppe had also completed an 11 day "CTO" program where he shadowed another deputy. (*See* PageID.1090.) Hoppe had also practiced with a cell-extraction-response group once or twice before the incident with Poole. (PageID.1096.) As for Stateler, by the time he responded to Poole's call for help, he had been working at the jail for almost two years and had completed the academy. (PageID.936.) And the academy included a "full four days of . . . use of force instruction." (PageID.976.) Given the training that Hoppe and Stateler received, a reasonable jury could not find both that their training was inadequate and that the inadequate training was because Macomb County was indifferent to detainees' rights. *See Ouza v. City of Dearborn Heights, Michigan*, 969 F.3d 265, 286–87 (6th Cir. 2020) (providing that to prevail on a failure-to-train theory, the plaintiff must show that the training "was inadequate for the tasks performed" and that "the inadequacy was the result of the municipality's deliberate indifference").

And even assuming that a reasonable jury could somehow find inadequate training attributable to the County's indifference, Poole's failure-to-train theory falters on yet another element: the inadequate training was not "closely related to" or the "actual[] cause[]" of Poole's injuries. *Ouza*, 969 F.3d at 286–87. As explained above, Hoppe did not use excessive force. So even if Macomb County failed to train Hoppe on the use of force, that failure was not a cause of Poole's

injuries. As for Stateler, Poole's account of the facts renders his training largely irrelevant. Assuming Macomb County failed to adequately train Stateler on the use of force, Stateler should have known that if a detainee is lying face down and not resisting, it is not lawful to slam a knee into the detainee's back then stand up and do it again. So Poole's claim that Macomb County failed to train its deputies fails at least because inadequate training was not "closely related to" or the "actual cause" of his injuries.

Poole also seeks to hold Macomb County liable on a failure-to-supervise theory. Poole only provides one piece of evidence for this claim, explaining, "there is not one performance evaluation or any indication from either of [Hoppe's or Stateler's] personnel files that [they] were ever supervised by Defendant Macomb County." (ECF No. 72, PageID.2300.) In support of this assertion, Poole cites *Ouza v. City of Dearborn Heights, Michigan*, 969 F.3d 265, 289 (6th Cir. 2020).

But the facts of *Ouza* are not at all like the facts of this case. There, the defendant officer admitted that he had not received any training on the use of force or probable cause for 14 years. 969 F.3d at 288. The Sixth Circuit reasoned that the absence of performance evaluations "[t]aken together" with the evidence of inadequate training "further" demonstrated that a jury could find municipal liability. *Id.* at 289. Here, Poole lacks even remotely comparable evidence of inadequate training. So the absence of performance evaluations is insufficient to establish the County's liability. *See Scott v. Kent Cnty.*, 679 F. App'x 435, 441 (6th Cir. 2017) ("To support his failure to supervise claim, Scott only offers evidence

that Kent County does not conduct yearly performance evaluations on its corrections officers. This is not sufficient to prevail under a failure to supervise theory."); *Amerson v. Waterford Twp.*, 562 F. App'x 484, 492 (6th Cir. 2014) (finding that without more, the failure to conduct performance evaluations "is not enough to show deliberate indifference").

In short, no reasonable jury could find for Poole on his claim against Macomb County.

IV.

For the reasons given, Hoppe and Macomb County's motion for summary judgment (ECF No. 63) is GRANTED. All claims against Hoppe and Macomb County are dismissed from this case.

Stateler's motion for summary judgment (ECF No. 64) is GRANTED IN PART and DENIED IN PART. It is granted only insofar as Count I asserts an Eighth Amendment claim against Stateler; because the Fourteenth Amendment is the proper basis for Poole's excessive force claim, Count I is DISMISSED. The only remaining claim in this case is Count III, and it only remains against Stateler.

SO ORDERED.

Dated: February 3, 2022

s/Laurie J. Michelson<br>
LAURIE J. MICHELSON<br>
UNITED STATES DISTRICT JUDGE